Our next case is Prime Mobility Products Corp. v. Permobil, 15-1585. Mr. Levine. Mr. Levine, we're ready. We're ready when you are, sir. Thank you, Your Honor. Did I pronounce your name correctly? You did. Okay. Philadelphia is the only town in the country where it's pronounced that way. Good morning. May it please the Court. I'm Gary Levine representing Prime Mobility. I'd like to focus this argument on Claim 7 of the 3-4-2 patent. I'd be happy to answer any questions the Court has about the motivation to combine issue, but we'll otherwise leave that issue to our briefs. Can I actually start? I'm sorry. Just start with that. Do I understand the state of the record on Mr. Richter's – Richter is the expert for the other side? Yes. Okay. I'm not sure whether it's his testimony. His declaration says, look at what Hosino – it provides a reason that you might want to shift the pivot point down and that that would be a routine design choice, but it does not say, and he did not say until the deposition, that if you did that in Gertson, there would be problems that would arise that would have to be adjusted for. Yes. Is that okay? That's correct. But that he never goes on to say those problems actually provide some performance deficiencies and a skilled artisan would be motivated to do this notwithstanding the arising of those performance deficiencies from the adjustments to prevent the instability problem. He did not say that. And in fact – Should he have had to say that? Yes, Your Honor. He should have had to say that because otherwise it is a failure of proof. It's Pride's position that there were stability problems and it was clear from the record that Dr. Richter was not – did not measure up to the level of ordinary skill in the art because he didn't recognize those deficiencies. It was only when he was confronted with them from the declaration and testimony of Pride's expert that he grudgingly admitted that yes, you could have a stability problem. He went on to say that you could fix it and the Board addressed that issue. But the Board never addressed the larger issue on the legal issue of obviousness of whether that additional work and the scant, if any, additional benefit that lowering the pivot would have made in the Gortzen reference would have made it obvious to undertake this in the first place. So just to be clear about the way that I'm identifying, maybe reducing this objection, it is that the Board stopped in terms of findings and Richter stopped in terms of his evidence at whether there would be a reason, some positive to be gained from making the change, but neither the Board in its findings nor Richter in his evidence said, I now recognize there would be negatives from that. If you make adjustments from the adjustments like moving the seat rearward, which might be something that people would not want to do, and what neither the Board found nor he said was notwithstanding or considering this mix of positives and negatives, a skilled artisan would be motivated to do this. Not that they could, but that they would be motivated to do that. Is that your argument? And is there any inaccuracy in what I just described? I believe it is accurate that, to my reading of the record, that he never went that extra step that saying, for example, that even there are stability problems, I now recognize that, one could adjust those stability problems, but he never took the next step of then saying that there would, with those adjustments, there would have been enough benefit to have justified making this modification in view of Faucino. And finally, in addition, the Board did not find that either, right? And the Board did not find that. Can I ask about the relative ordering of presentation of arguments and evidence here? Yes. As I understand it, the petitioner came forward first and relied on an expert to say that, oh, it would be obvious to, one would be motivated to move the arm pivot point from something high to low because Faucino teaches that and teaches the advantages of doing that. And then it was your side that came forward and said, well, you're going to have stability problems whenever you're dropping the center of gravity of something. And, you know, these wheelchairs, stability is paramount. Absolutely. And then they came back, the petitioner came back and said, had the expert come back and say, well, there's no way I would drop the arm pivot point without also considering stability issues. But adjustments could be made. In fact, the Gertsen reference describes different things you can do, different adjustments you can make to improve this, that, or the other, perhaps even stability. And so it was well known in the art. Was it at that time that you and your expert came forward and said, okay, now all those interesting adjustments to improve or preserve stability, those would have disadvantages or negative consequences. So I'm just trying to figure out the timing here of, or did you and your expert come forward initially when you identified the stability problems, also say, even if you were to compensate for those stability problems, then that would have its own set of problems. I'm trying to figure out at what point did the petitioner have an opportunity to respond to any arguments your side might have had about any adjustments or compensations you would do to protect stability would create a host of other disadvantages. Can you help me with that? To be fair, I believe that my recollection of that record is that they came forward and just said it would have been a routine adjustment. Our expert said there are major problems with doing this. They came back in deposition. They came back and said it could be remedied. And we came back and said there are problems. The remedies are difficult. The remedies are extensive. Plus, the Gortzen Chair was built for a different purpose. It already was able to climb curbs by a completely different mechanism from what Hosino taught. But I guess in terms of identifying any problems with doing the adjustments to preserve stability, after your side had identified that, I'm guessing because this is such a compact proceeding, the patent owner or the petitioner didn't really have an opportunity to come forward with his expert and say, okay, you're telling me that there would be problems in costs and those costs outweigh the advantages identified in Hosino. I disagree, and here's why I think any perceived disadvantages are really minimal or negligible. Well, the importance here is that they had the opportunity to rebut our expert's statement on the stability problems in their reply brief. It is petitioner's burden of proof to prove obviousness. They didn't make the extra step in their reply brief. They didn't go the extra mile or the extra couple feet to put to bed the issue of whether or not there were benefits that still would have obtained from the changes they were suggesting. And it was their burden of proof the entire time. And we've always contended that they've never met that burden of proof right from the get-go in the petition. Is it your view of obviousness that if, let's take it for granted that Hosino does have an advantage of, it does describe one, and so for that reason there's a perceived reason to drop the arm pivot point on Gertson. But now maybe there's some disadvantages that come with that. Maybe you can compensate for those, but maybe those compensations have some disadvantages. Do you think that the way motivation to combine or reason to make a combination, there has to be a net plus? Like if you take into account the advantages from Hosino and then maybe some disadvantages or a host of little disadvantages in making adjustments to do the Hosino alternative, does it have to be a net positive in order for it to be obvious? Yes, Your Honor, I believe it does have to be a net positive because just like one must read the entirety of a reference for what it teaches in an obviousness analysis, one must read the entire brought-to-bear universe of references for what they teach and all the facts. And one of ordinary skill in the art, and this is even recognized in one of the MPEP regs, one of ordinary skill in the art may not undertake an analysis if that person of ordinary skill in the art recognizes up front. Isn't that a judgment call by the artisan skilled in the art, whether combining creates a plus or not? I mean, you can have two references and the references by themselves may complement each other, but there's no express plus. But it's the artisan that looks at that and says, uh-huh, if I combine them, I can have a plus. It is a judgment call by the artisan, but again, the artisan is this hypothetical construct here and what the artisan's judgment is in motivation to combine and ultimately would it have been obvious is a legal construct that the court refused to know about. And the legal conclusion must take into account all of the underlying facts and circumstances. So as a matter of law, even if one of ordinary skill in the art would conclude that, yes, there's some trade-offs, I get some advantages, but I also get some disadvantages, and the disadvantages maybe outweigh the advantages. And as a matter of law, that can never be obvious. A change to something in the prior art that maybe isn't as good as that prior art reference, that's always a non-obvious change? No, I think it's a question of degree. But the question here is, was there enough of a benefit, given the different constructs of the Gortzon chair versus the Huccino chair? And given the additional work that would have been necessary to overcome the stability issues that their expert admitted would occur, the question is, would one of ordinary skill in the art, having recognized those stability issues in the first instance, been motivated to undertake this change? Why? Because it would include additional work? Not simply because it would include additional work. It's a question of, would the additional work outweigh any benefit? Or more precisely, even if, the question is whether there was any evidence, including from Richter, about this balance of positives and negatives. There was none. That seems to me the core of it. He might have testified that some chair users don't mind sitting back, some chair users don't mind having to accelerate more to climb the curb, and there's a market for the faster accelerating ones and the slower accelerating ones, and the rear seat and the forward seat, and both of them would have pluses and minuses, and different people would have different preferences, and a skilled artisan would be interested in that. But at least I'm not seeing that there is such testimony. It's not for us to say what the balance of positives and negatives is, but for there to be evidence about what a skilled artisan would say about that. Precisely, and it was their burden of proof, and they didn't meet that. I would make one other comment about the, there was a comment from a bench about the Gortzon reference having taught ways to overcome stability. Whatever Gortzon taught was in the context of the high pivot that Gortzon had, and those remedies would not necessarily affect, obtain, or be relevant to a lowered pivot. And where in the record is the best evidence for the criticisms for making the stability adjustments when you also follow the Asino suggestion to move the arm pivot point down? The best point would have been in our expert's declarations. Okay. In the reply. Okay, you're close to, you used up all your time, but we'll restore you back to your original rebuttal time, okay? Okay. But can I just ask you one question that's not, shouldn't consume your time? On the 343 patent, when I look at the figures, the arm pivot point for these front caster wheels appear to consistently be above the drive wheel axis. Am I wrong in reading the 343 figures that way? No, they are always below the drive wheel axis. Which figure are you looking at? Any of them. Okay. How about figure 3B? The plate pivots at pivot point 29, and the plate, that pivoting plate, that's the motor mount. That's the mounting plate that we refer to. That pivots about point 29. That's the connection to the frame. That's the pivot point, and that is below a line drawn between the axis of the front caster wheel 66. That axis is not designated by a numeral, but you could see it there. And if you drew a line between the axis of the front caster wheel and the axis of the drive wheel, which is shown as ADW, pivot point 29 for the plate would be below that line. Not if you drew a line in this picture, but you say otherwise. It actually would not be below that. Anyway, it's not clear it would be. We have additional questions. Can I just ask you, since we're talking about the plate, your view is that this is about claim 7, right? Yes. Which I know you wanted to say something about. That when claim 7 says we have something that is substantially planar and oriented, perpendicular to the drive wheel axis, that has got to be a reference to perpendicularity between the line that we imagine the axis to be and the feature that makes this mounting plate substantially planar, namely its planar surface. And there's only one thing that a line and a plane can do to be perpendicular, which is to go like that and not to go like that. That's right. If this represents the mounting plate, you've got the front caster arm attached to the mounting plate. You've got the motor drive attached to the mounting plate. And the mounting plate has a pivot point where it's connected to the frame. And the motor torque causes the mounting plate to rotate or pivot in this plane. This is the drive wheel axis. That's perpendicular to the plane of the mounting plate. It is perpendicular to the plate. It's perpendicular here. It's perpendicular here. The issue here is that the board, without making any construction of its own, simply said, there's prior art that shows a plate that's oriented like this. Not a plate, a motor, isn't it? Well, they refer to a plate. There is a plate. Oh, okay, two different things. Gerson prior art and the internal reference of the earlier. Yeah, they refer to Gerson for the supposed satisfaction of the elements of Claim 7. And they say, well, here's the drive wheel axis. And here's the plate. And it's perpendicular to the plate. And they say, you know, because it's this. Well, in plane geometry, that is not perpendicular to the plate. It creates a 90 degree angle. Only with an edge of the plate. But not the plane of the plate. And the significant feature of Claim 7 is the planar plate. It said planar plate and perpendicular were added together. The plate is a three-dimensional object, though, right? But only two dimensions are ever referred to in the specification. The planar aspect. Nowhere in the specification is the plate ever defined by the shape, longitudinal extent, the edges, or anything else. To take the board's construction, for example, if you had a plate like this, where is it perpendicular? There's nothing in the claim that refers to the shape of the plate. And it doesn't make any sense to refer to define the scope of the claim by what is otherwise an unmentioned, unclaimed, undefined dimension. It's only the planar aspect of the plate that is consistently in play. And as I've also said in the brief, the language that the specification uses tracks word for word the language in the claim. And when the specification refers to the only time the specification uses the language in the claim, the only relevant context of perpendicularity in this case. If we find error in the claim construction, then how does that affect the obviousness analysis? I think the obviousness goes away because with a reversal of the claim construction to require, in essence, that perpendicularity is perpendicular to the plane of the plate, the significant aspect of the claim plate, the planar surface, there is no reference in the record that meets that. Gortzen is parallel. In Gortzen, that's parallel. Parallel cannot be perpendicular, and there's no other reference. So should the board, as we ask, reverse the claim construction and adopt Pryde's construction, it should reverse without remand for further proceedings other than to ask the board to reverse? No. Okay. Thank you. We have your argument. Thank you. Ms. Wigmore, I'm going to add five minutes of time to your 15 minutes if you need the time. Thank you, Your Honor. Good morning, and may it please the Court. My name is Amy Wigmore, and I represent the FLE for Mobile, Inc. I would like to start with the perpendicularity issue for Claim 7 where Mr. Levin left off. The board properly rejected Pryde's attempt to limit the meaning of the term perpendicular to a single embodiment disclosed in Figure 3B and 6A of the 343 patent. Pryde's proposed construction is inconsistent with both the Phillips standard and the broadest reasonable interpretation standard that applies to an IPR where the claim has not expired as in this case. To limit the meaning of a term to a specific referred embodiment, a specification I'm sorry, but that's, I'll just tell you how I'm thinking about it. It seems to me it has, I mean, there's no question here about limiting the meaning to the specification. I read those words. It says there's this, and it's supposed to be perpendicular to this. This is described in terms of one and only one feature. It's planar feature. I don't understand how as a matter of English and ninth grade geometry that doesn't mean something other than this. That when you translate the two so that they intersect, translate by an addition of a constant triplicate of variables without any changing of orientation in three-dimensional space, they not only intersect at one point but that they form a right angle. And that's not Gerson. Respectfully, Your Honor, I disagree for a couple of reasons. First of all, if we look at that preferred embodiment, which can be found Just tell me about the language. The language. What does perpendicular mean here when referenced to an axis? This is an axis, so we're now idealizing it into a line. And another item, which is what this is going to be perpendicular to, described with respect to one and only one feature. Namely, it's substantially planar other than this. The claim language talks about the mounting plate being substantially planar and is oriented perpendicular to the drive-wheel axis. Those are two separate requirements, and the specification informs the meaning of the claim. The specification specifically refers and uses the phrase perpendicular to the drive-wheel axis to describe and actually incorporates by reference this Schaffner 165. And that's an incorporation of a reference of perpendicularity between an axis and this three-dimensional thing called a motor. Now, in math, unless you tell me I'm wrong, perpendicularity exists only between a line and either another line or a surface, something viewed as a two-dimensional object, not a three-dimensional thing. So that immediately tells you when you're talking about a motor that you must be referring to perpendicularity with respect to either some surface or what is pretty self-evident in context, the longitudinal axis of the motor. Correct. It seems to be equally plain that that is not what is meant here when the reference is to perpendicularity between the axis idealized into a line and a mounting plate that's substantially planar, which calls attention to one and only one feature, namely the plane feature. The only time the phrase perpendicular to the drive-wheel axis is used in the specification, it's by reference to the Schaffner embodiment. And it is the longitudinal extent of that Schaffner motor, and if it would be helpful, I can refer the court to the Schaffner reference, either Figure 9 or Figure 4 that can be found at JA 168 or 163. The problem there with the Schaffner reference is that the motor, it's not shaped like a plate. It's the longitudinal extent, as described in the specification, that would be, if they touched, oriented at a right angle. It's worth pointing out that even with respect to the preferred embodiment that Pride is relying on, they don't touch either. It's the mounting plate in that particular figure, 3B, is oriented north-south. And then you have the drive-wheel axis, which is like the z-axis coming out of the graph, and they are oriented at a 90-degree angle to one another. For the Schaffner embodiment, you have the longitudinal extent of the motor oriented along the x-axis, or east-west. Again, that's oriented at a 90-degree angle to the z-axis. None of these embodiments intersect in the traditional geometric sense, but they are oriented at 90-degree angles. But perpendicularity in free space means that if you simply translate things so that they intersect, you get a single-point intersection, plus the angle formed is 90 degrees. That's correct, and what the specification tells us, that as used in this patent, it's meant to encompass at least both the north-south and east-west configuration of the mounting plate. And the specification couldn't be more clear, and we have to keep in mind that we're applying the broadest reasonable interpretation standard here. Pride had the opportunity, if they wanted to have a claim that said the plane must intersect at a right angle or perpendicularly. They could have amended the claim in that way, but instead, they left it as it was, and they were left with this specification that talks about two different orientations, one of which is Schaffner, one of which is Figure 3B, meeting that 90-degree orientation requirement. And there's no dispute, it's worth pointing out, that Gertzen, if Schaffner satisfies it, then so does Gertzen, and they have not disputed that below. So the sole question for the court is whether the board properly applied claim construction principles by looking at the specification, seeing these two different orientations being described as perpendicular, and concluding that under broadest reasonable interpretation, those two embodiments must be encompassed. The 343 spec, when it talks about a mounting plate, it describes it having a few different components, features, one being an upper portion. There's no, can't really say there's an upper portion to Gertzen's mounting plate, can you? Well, you could, and this does go to the court's question about even if the construction were... You know, when the mounting plate is like this, there's... There's a thickness. Where's the upper portion here? Well, I think one could define that in two different ways. According to our construction, if you're looking at the longitudinal extent, it could be in the east-west configuration, the left-hand side. But it's important to keep in mind that Gertzen is... The embodiment of Gertzen has a thickness to it. It's not flat. Planar doesn't exist in a medical device. It's three-dimensional. So even if the construction that Pride advocates were accepted, you still have a thickness to that mounting plate that would intersect in the way that the mounting plate in Figure 3B does. You can't look at these as two-dimensional configurations because they are three-dimensional, and it is not resolved... So, I mean, every product in our world is three-dimensional. Correct. So when the reference is to perpendicularity, it's a reference to some idealized feature of it. In this Claim 7, how can that be anything other than the thing that makes it substantially planar? We need to look to the specification, and the specification tells us, using that very phrase, perpendicular to the drive wheel axis, it tells us that it encompasses both the vertical and the horizontal orientations that are oriented at a 90-degree angle. They don't need to touch. They do not touch. But all of them, both the vertical and the horizontal, are at a 90 degree to the Z axis, and there's nothing in the specification that suggests that the claim should be limited further than that, right after that limit. How many dimensions, or what's the dimension of the surface of a plane? We're just looking at the surface of a plane, the surface of this paper. How many dimensions are we talking about? Traditionally, in geometry, the plane is a two-dimensional figure. Now, keep in mind... So if the claim is directed to a planar, a plane... Substantially planar, which I think Pride attempts to read out, but all that means is it's substantially flat. It's not two-dimensional. I don't think they're arguing that. Why would you turn that on its head and say, okay, we have the opportunity to make this two-dimensional figure a three-dimensional figure? And if it's three-dimensional, it seems to me that you can always, at some point in space, there's always an intersection when you're dealing with three-dimensional figures. Well, that's correct, and I think what we're saying, particularly... So doesn't that turn the claim on its head? I mean, obviously, the patent doesn't speak to that. It's trying to create a limitation. The patent doesn't adequately speak to that in the way that Pride wants it to. Well, it uses the word plane, a planar surface. It does not. It uses the word substantially planar. And is perpendicular to the drive-wheel axis, oriented perpendicular to the drive-wheel axis. Substantially planar describes the mounting plate. Oriented perpendicular describes how that mounting plate would intersect in three dimensions with the drive-wheel axis. And we know from the reference to Schaffner that it's not just this vertical structure of 3B, which is described as a preferred embodiment, but it must encompass both. I would like to turn briefly to the question of motivation and some of the questions that were raised there. I think the first point I wanted to emphasize is that motivation to combine is a question of fact that is reviewed for substantial evidence. And there's ample evidence on which the board relied to support its conclusion that there was a motivation to combine. Let's put aside... There are two questions. One, what the board found, and the second is what the evidence shows. So for a moment, just focus on what the board found. Where did the board find... I recognize there's a stability problem with making a... moving the Hosino... taking the Hosino... I got that name right... and using that idea in Gertsen. I recognize that there are stability problems that would come from that. I recognize that there are ways described in Gertsen to adjust for the stability problems. But then it seems to me the crucial thing is, where did it say, once I take account of the adjustments, a skilled artisan would be motivated to do that? Let me just point the court to both the board's opinion and to Dr. Richter's declaration. In the board opinion, it did, at JA18, credit Dr. Richter's testimony that a person of ordinary skill in the art would have known how to change various other parameters in order to achieve a stable version of the claimed invention. Right, but as we recently said in Belden, building on InTouch and the active video case, knowing how to is not enough to say would be motivated to do. Belden also tells us that one looks at the art's teaching as a whole. You're not talking about physical combinability here, and the case law is clear on that. You're talking about a feature that has virtues that's described in one piece of art, and would a person looking at another piece of art decide that those two things working together could have a benefit? Right, but as I understand it, Richter eventually, in the deposition, agreed that if you did nothing but move the Hosino pivot, you'd have a problem. But, he said, a skilled artisan would know how to address that problem, and then you point to a few places in Gertson. Let's assume for a moment that those would be appropriate solutions. There's a dispute about that, but assume that that would be true. One of them would be adjust the amount of acceleration needed. Now, that sounds like it's possibly a negative. You've got to go really fast riding the wheelchair to get over the curb. I assume it's fast rather than slow, but anyway, it says adjust the acceleration. Another is move the seat back. I bet there's a reason, though I don't know what it is, that the seat is where it is as opposed to further back. So, there are negatives that come with the adjustments needed to address the stability problem, and what I don't see is either in the board findings or in Richter any addressing of that that says taking those realities into account, a skilled artisan would still be motivated to do that. Dr. Richter did, and Judge Ten did properly outline the chronology of events, as Mr. Levin agreed, that the stability question was not raised until Pryde's brief, at which point Dr. Richter responded with a declaration. So, it's patent owner response and then the reply you're talking about? Correct. And then he did file a declaration that is found, I think the relevant portions are found, at JA 1049 through 51. Is this one of those situations where everything is in here twice? I don't know that this particular one is. Is this paragraph 38 of his declaration? This is paragraph... Sorry, I'm looking at... 39. Yes. So, he talks about... I'm sorry, what page are we on? Sorry, I was looking at our brief, but it's... What did you say, 1049 or something? Yes. And so, he talks... You find in his declaration both a description of the benefits of casino, which I can give you the page numbers for that. Is 1049... That's a different declaration from what's at 330. Sorry, 1049, I misspoke, is the brief that was submitted along with the declaration. So, that's what I mean. I mean, what I'm looking at in his declaration is the crucial paragraph, paragraph 39, is at JA 340 to 341. Possibly it's somewhere else, too. This is one of these problems. Yes, there are two sets. Parties don't use the same citations. Two sets of declarations for the two different IPRs is, I think, why we have multiple versions. So, at JA 340... I took it that paragraph 39 was the place that he said what he had to say. But maybe I've missed something. Well, about casino, it's important to note he makes two points about casino. One is that it teaches this motivation. But he also teaches it's a routine design choice. There's only so many places this pivot can go. Right, but just maybe nobody would want one of those places. Well, it has to be at least one of those places. It has to be at above or below. Right. Presumably that's right. Maybe the one below is one that nobody would want. And as Permobil argued and as the board accepted, and it's important to keep in mind, the board can bring its own experience and judgment to bear as the Belden case indicates on what a person of ordinary skill in the art would be motivated to do. The teaching of casino, the teaching of Gertsen about ways to adjust stability, those things would be looked at independently and it would be reasonable to combine them to achieve the benefits. Gertsen is important to note, doesn't... I'm sorry, unless there were offsetting negatives that anybody would recognize as ones that even when adjusted for would lead you to say, I won't do that. But the board made a factual determination based on the record supported by substantial evidence that there would be routine ways to account for this, that it would not be such a great disadvantage that you wouldn't do it and we need to defer to that evidence. Well, let's put a finer point on that. I think you're right. The board found that one of ordinary skill in the art would know how to compensate for the stability concerns once you lower the arm pivot point. But I didn't see the board explicitly say, well, the patent owner has identified problems when you do that. And so now, in the overall obviousness context, we, the patent board, have to now do some kind of evaluation where we throw everything in the mix. We focus on the advantages identified in Hacino, but we also must weigh that against the trade-offs being described by the patent owner about all the costs that come with making the adjustments to preserve stability. And when we consider all of that together, we still nevertheless find that Hacino's advantages are strong enough motivation in the face of all of these costs that one of ordinary skill back in this era would nevertheless go forward and do all of this and take all this on and make all these adjustments to the primary reference. So I would direct the court to pages JA19 and 20 of the board's opinion. This is where the board reaches the conclusion that a person of ordinary skill in the art would have known how to compensate for the reduction in the stability. That's on JA19. And then on JA20, about midway down, the board says it's not persuaded by the patent owner's argument that a person of ordinary skill in the art would not look to Hacino to modify the teaching of Gertsen due to the physical differences and different uses of the chairs. So the board, whether explicitly or implicitly, has carefully considered this issue about whether a person of ordinary skill would look to Gertsen and learn from it what it could and look to Hacino and learn from it what it could and use this low pivot configuration. It's also worth noting that Gertsen does not teach the importance of a high pivot. It's silent as to this pivot and the line between the drive wheel axis. So there's no teaching away here. The question is what can be drawn from the art by a person of skill in the art? And I think the Belden case that was decided in November of 2015 informs the view that you look at the references in and of themselves, not how they would be combined together. And the art and the icon fitness case that we cite in our brief, the law also provides that you have to take into account the modifications that a person of skill in the art would make. It's an expansive and flexible analysis and there's ample evidence in this record that there's only a few options. But you also agree that in the motivation to combine analysis and the obviousness analysis, the board has to take into account those trade-offs as well as the advantages, those costs that might come with taking on those advantages. Well, if by costs you mean economic costs, I would not agree. No, no, no, I'm sorry. Not economic costs, but now some disadvantages. Maybe you've got to really increase the spring force. Maybe the wheelchair has to go a lot faster. Or maybe there's concerns about other things when you reorient the wheelchair. That would be something that would be considered. I would point out that Pride's main argument against this combination was not that the adjustments that Gertsen describes would be inappropriate. Their argument is it would be unnecessary economic costs because Gertsen worked just fine. That was their argument, not that the stability adjustments would be bad in some way. Or I guess another argument would be whatever benefit you get from Asino would be really minor because Gertsen's wheels are already rising up on their own without any need for the pivot. And that is the argument that they made, and that argument fails both factually and legally. Gertsen's reference acknowledges that the wheel can still, even with the Gertsen active suspension, touch the curb and the Asino low pivot would provide an advantage as it explains in that situation. The economic argument they make is completely inconsistent with the case law. The orthopedic case that's cited in our brief indicates that economics is not a relevant factor in motivation. And you just need to have a suitable device, not the most desirable or best device in order to support motivation. Can I ask you a completely non-legal question? I guess it's a physics question. Can you explain how the torque causes the front to rise? I will do my best to do that. So the engine, the motor, is, through this active suspension system, attached to the front drive wheel and so it's that forward acceleration that you get from the motor that lifts the wheel and pushes it either over the curb or... Does this have to do with the spinning of the motor, the torque, or something else? I can't answer the details of that, but the torque does come from the motor. And the pivot between... It's like an automobile. When you accelerate an automobile, you've got rear-wheel drive, the front will come up on its own. Correct. It's just popping a wheelie? But it's not always a wheelie, and I do think that's important because Gertsen acknowledges that sometimes you get most of the way up the curb, but not all the way up the curb, and that's where the low pivot on top of the active suspension is really important. Okay. Thank you very much. Thank you. Mr. Levine, you've got four minutes. I'll give you additional time if you need it or if my colleagues have questions. Thank you, Your Honor. The fundamental error of the Board as to Claim 7 was to believe that it had to interpret the phrase perpendicular to the drive wheel axis to read on all the uses of the word perpendicular in the spec when only one of those uses is relevant to the language of the claim. And that's the use that is in Column 8 and Column 13 rather than the Schaffner use where the exact same language that appears in the claim is used in the spec. And at that point in both those points which are the only times that the specification refers to the spec... It's not the exact same language but because the word is used once whereas in the claim it's used twice. Does that make a difference? I think the other side does argue that it makes a difference. They argue that it makes a difference. It's a property of transitivity, Your Honor. If two things are A then they are both A. It has both of the... It has... They're saying the spec and the claim say that the plate has both of these characteristics. It is substantially planar and it is perpendicular to the driver. Your argument rests on somehow integrating those two features or interconnecting creating some relationship between those two features but there's so many other examples where you would never do that. Your... Examples in the spec, Your Honor? Just hypotheticals. The mounting plate is green and is made out of aluminum. You don't really think of the fact that it's aluminum necessarily causes it to be green but do you see my point? I see your point just because something has those two characteristics doesn't mean... Something is X and is Y. That doesn't mean that the X and Y necessarily have some kind of mixed relationship. Except here when you're talking about a planar plate and something that's perpendicular to the plate a wheel axis that is one-dimensional construct that would be the plain meaning of those two characteristics. What if it just said a mounting plate that is perpendicular to the drive wheel axis? Then would you say okay my argument doesn't work anymore? No, I wouldn't say that because you still have to look at what a plate is and a plate is always has at least some planar aspect to it. Once you talk about a plate when you conjure up the image of a plate you're not thinking about the thickness of the plate you're thinking about the contour. The two-dimensional contour. But we have more than that here because both times the only time that the specification refers to the mounting plate being substantially planar and perpendicular oriented perpendicular to the drive wheel axis it refers to figures in the patent 3A and 7A. And if you look at those figures it's like this. And that the sameness of the language where it's used in the specification and the claim and the specific tying to the figures brings this case really into this court's decision and brings it very close to the C.R. Bard case where a specific tie between the specification and figures was enough for the court to look at what the figures taught and incorporate aspects of those figures into the claim. And here I think we have plain meaning anyway and this only confirms the plain meaning. What's the effect of the word substantially with respect to addressing the surface of the plain? Well, substantially was never argued below as a really point of distinction here. And substantially planar means it could have some imperfections but the surface    still be a surface. For example, if there were a little bump in this it would still be substantially planar. Or the curvy piece of paper. That's hard to make curvy. It would still be a surface. It would still be a surface and it would still be a plane. And this would be in a single plane. Even if it had a slight bump or a slight wave or like a slight sinusoidal wave in the surface. But whatever substantially planar means or doesn't mean, it doesn't bring into relevance this Schaffner, the Schaffner motor housing which is quite frankly a red carpet. It's a red carpet. And it's not quite as   carpet as it should be. It's a red carpet. And it's not quite as a red carpet as it should be.        quite as a red carpet as it should be. And the Schaffner motor housing is a red carpet, and it's not just a red carpet, it's  red carpet.     housing is a red carpet, and it's not just a red carpet, it's a red carpet, and     red carpet, it's a red carpet.